IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ARIIX LLC,<br><br>      Plaintiff,<br><br>v.<br><br>USANA HEALTH SCIENCES, INC.,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>Case No. 2:22-cv-00313-JNP-DAO<br><br>District Judge Jill N. Parrish |

Before the court is a motion to dismiss filed by Defendant Usana Health Sciences, Inc. ("Usana"). ECF No. 17. The court DENIES Defendant's motion.

## FACTUAL BACKGROUND[1]

Usana is a company that is incorporated in Utah and sells supplements. Plaintiff Ariix LLC ("Ariix") was founded by former Usana executives and is a rival of Usana. ECF No. 2 at 16. Ariix and Usana both employ a direct marketing business model to sell supplements, meaning that Ariix and Usana compete in both consumer supplement sales and in sales representative recruitment. *Id.*

Nutritional supplements are largely unregulated, and there have been several recent scandals regarding supplement quality. *Id.* at 6. To empower consumers and sales representatives to make informed decisions, NutriSearch Corporation ("NutriSearch"), a company with its principal place of business in British Columbia, Canada, publishes the *NutriSearch Comparative Guide to Nutritional Supplements* ("Guide"). *Id.* at 6; ECF No. 17-2 at 6. The Guide, which is the

---

[1] As this is a motion to dismiss, the court "accept[s] as true all well-pleaded factual allegations in the complaint . . . ." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013).

leading source regarding nutritional supplement quality, is written by Lyle MacWilliam ("MacWilliam") and purports to provide independent and unbiased supplement reviews. ECF No. 2 at 6-11.

On February 16, 2017, Ariix filed a complaint against NutriSearch and MacWilliam in the Southern District of California that contains similar, if not identical, factual allegations and claims to the ones contained in this complaint. *See* Am. Compl., *Ariix LLC v. NutriSearch Corp.*, Case No. 17-cv-320-LAB-BGS, ECF No. 17-2. Ariix asserted that NutriSearch and MacWilliam had violated 15 U.S.C. § 1125(a) of the Lanham Act by engaging in false advertising. The statute provides in relevant part that

> any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which—in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Ariix asserted that MacWilliam and NutriSearch had represented that the guide presented independent and unbiased reviews when, in actuality, NutriSearch and MacWilliam had manipulated the Guide to promote Usana's products. Ariix alleged that Usana paid MacWilliam to give Usana's supplements the top rating in the Guide. As a result, "[t]he misstatements directly reduced Ariix's revenues by causing both consumers and professionals to select Usana over Ariix." ECF No. 2 at 32.

The Guide contains several statements depicting itself as an independent, unbiased source of information. *See* ECF No. 2 at 7 ("This guide was not commissioned by any . . . company whose products may be represented herein. The . . . findings are the sole creative effort of the author and

NutriSearch Corporation, neither of whom is associated with any manufacturer or product represented in this guide."). The Guide purports to provide "scientifically objective" unbiased ratings using "18 criteria developed by 12 independent nutritional authorities, and certifications based on independent laboratory review." *Id.* at 2. Previous editions of the guide have stated that "[i]t is not a product endorsement . . . . [but] simply documents recent findings in the scientific literature." *Id.* at 7.

MacWilliam and NutriSearch have also separately claimed that the Guide is independent and objective. In 2016, MacWilliam appeared on the Dr. Oz show and stated that the Guide uses scientific evidence to avoid incorporating MacWilliam or NutriSearch's biases. *Id.* at 7–8. NutriSearch explains on its website that it uses a mathematical formula to calculate rankings in the Guide. *Id.* at 8.

Usana has taken advantage of the neutral image of the Guide in order to promote its own products. For example, when Usana receives a new award from the Guide, it contextualizes the award by quoting language from the Guide claiming that it provides independent and objective evaluations. *Id.* at 25. Usana's website includes pictures of MacWilliam and the Guide next to quotes made by MacWilliam about his confidence in the quality of Usana's supplements. *Id.* at 24–25.

In truth, Usana is not a disinterested third-party. "Usana has directly paid NutriSearch and MacWilliam hundreds of thousands of dollars per year in fixed stipends, speaking fees, promotion fees, and promotion costs." *Id.* at 11. MacWilliam concocted the Guide as a sales tool while working as a Usana sales representative. *Id.* at 2. In 2005, MacWilliam informed Usana executives that "I should not be on the board or a representative anymore because it looks like I'm biased. I am going to create more of a third-party appearance, but I'd like you to use me for speaking and

support me." ECF No. 17-2 at 12. Usana responded, "Yes, if you give us the number-one rating." *Id.*

In 2008, Usana withdrew its support after NutriSearch awarded several other supplement companies, alongside Usana, with a Gold Medal rating in the Guide. ECF No. 2 at 12. MacWilliam and NutriSearch experienced a sharp decline in book sales as a result and Usana also declined to extend additional speaking opportunities to MacWilliam. *Id.* When MacWilliam complained to Usana's executives, they informed him that Usana preferred being the only company that received the Guide's highest accolade. *Id.* MacWilliam asked "would it help if Usana is number one in some way?" *Id.* Usana responded affirmatively. *Id.* The following year, MacWilliam added a new "Editor's Choice" award to the Guide, which was solely bestowed upon Usana. *Id.* MacWilliam approached Usana for his reward and Usana paid MacWilliam $90,000 to endorse Usana in a promotional summer tour. *Id.* at 12–13.

The following year, MacWilliam informed Usana that, as calculated by the Guide's publicly disclosed criteria, Usana would not receive the Guide's top ranking. *Id.* at 13. Usana reminded MacWilliam that "we pay you to make us number one." *Id.* at 13. MacWilliam stated that he would either need to alter the Guide's ranking algorithm or Usana would need to reformulate its supplements. *Id.* Usana and MacWilliam then collaborated to ensure that Usana maintained the top position. *Id.*

Usana financially benefits from the Guide. Usana arranged the initial publishing agreement between NutriSearch, MacWilliam, and ProTools, which publishes the guide. *Id.* at 11. As a result of arranging the initial publication agreement, Usana receives a portion of the profits derived from the Guide's sales. *Id.* at 12. Usana incorporates the Guide into its marketing training. Sales representatives are told to purchase the guide, "learn it, refer to it in making sales, and . . . pitch

4

the guide to end consumers." *Id.* at 11. Usana characterizes payments to NutriSearch and MacWilliam as marketing expenses. *Id.* at 10. Usana reposts testimonial statements made by MacWilliam on its website and social media pages, and issues press releases announcing the awards it receives from the Guide.

Usana is also involved in editorial changes to the Guide. Usana orders MacWilliam to meet with Usana's chief product officer every year. *Id.* at 13. At these annual meetings, Usana informs MacWilliam of any changes to its supplement formulation or to its marketing strategies. *Id.* at 14. MacWilliam then edits the guide to reflect Usana's changes. In 2013, Usana increased the Vitamin D and Iodine content in its supplements and rebranded to focus on these additions. ECF No. 17-2 at 19. The Fifth Edition of the Guide was then "rewritten from cover to cover" to highlight "the most recent and exciting scientific findings on two super-nutrients: Vitamin D and Iodine." ECF No. 2 at 14; ECF No. 17-2 at 19. Prior to the Sixth Edition of the Guide, Usana reprinted its supplement labels to emphasize the potency of its products with regards to "cell signaling." ECF No. 2 at 14. The Sixth Edition noted that the Guide had been "completely rewritten" to account for "groundbreaking discoveries" in cell-signaling. *Id.* Usana ordered NutriSearch to add a new platinum tier of achievement to the Sixth Edition and Usana was the only company awarded with a platinum level rating in the Sixth Edition. *Id.* at 14.

Usana leveraged its relationship with MacWilliam and NutriSearch not only for its own benefit, but also to actively harm competitors like Ariix. In 2011, Ariix was preparing to launch its competing supplement product, Ariix Optimal. ECF No. 17-2 at 21. Usana had received preliminary information about Ariix Optimal that it then relayed to NutriSearch. ECF No. 2 at 16. Although NutriSearch would later revise its rating of Ariix Optimal to five stars, NutriSearch initially awarded Ariix a three-and-a-half stars rating. *Id.* at 17. Usana instructed NutriSearch to

5

print a new version of the Guide displaying Ariix Optimal's three-and-a-half stars rating prior to Ariix's product launch. *Id* at 16.

Once Ariix obtained a five-star rating, Ariix could apply for the Guide's Gold Medal of Achievement by submitting lab reports that verified the composition of its supplements. *Id.* at 17. Ariix submitted ISO-17025 certified lab reports to NutriSearch, which NutriSearch rejected. *Id.* at 18. NutriSearch explained that while previous Gold Medal recipients who had submitted ISO-17025 lab reports—such as Usana—were grandfathered in, NutriSearch no longer accepted ISO-17025 lab reports due to recent developments that undercut the credibility of ISO-17025 labs. *Id.* To overcome this hurdle, Ariix worked with NutriSearch to develop new testing protocols. *Id.* NutriSearch thanked Ariix for investing significant financial resources developing the new Gold Medal testing criteria, but informed Ariix that Ariix's Gold Medal would not be displayed until NutriSearch published a new edition of the Guide. *Id.* at 19. With the expectation that NutriSearch would revise the then-current edition of the Guide to display Ariix's Gold Medal qualifications, Ariix reapplied for Gold Medal certification using the lab reports that had been developed in accordance with NutriSearch's new procedure. *Id.* However, NutriSearch then denied Ariix's application. *Id.* NutriSearch explained that it was no longer publishing revisions to the current edition of the Guide because it "could no longer confidently assure the consumer that what is on the label is what is in the bottle." *Id.* At the same time that NutriSearch claimed that its concerns regarding testing accuracy precluded it from awarding Ariix a Gold Medal certification, NutriSearch and MacWilliam represented to consumers that they were confident in the Guide's verification abilities. *Id.*

In 2014, MacWilliam declined Ariix's offer to speak on behalf of Ariix. MacWilliam stated that he no longer wanted to travel. *Id.* at 20–21; ECF No. 17-2 at 27. However, MacWilliam

6

continued to travel and promote Usana. ECF No. 2 at 21. Ariix confronted NutriSearch about the apparent exclusive relationship between MacWilliam and Usana. *Id.* MacWilliam responded by admitting that Usana would stop supporting him financially if MacWilliam spoke for Ariix. *Id.* ("[Usana] will cut me off the second I . . . [speak for Ariix] . . . .").

## PROCEDURAL HISTORY

On February 16, 2017, Ariix filed a complaint against NutriSearch and MacWilliam in the Southern District of California. ECF No. 17-1. NutriSearch and MacWilliam filed a motion to dismiss, which the district court granted. ECF No. 17-4 at 2. The court gave Ariix leave to amend its complaint. *Id*. Subsequently, Ariix filed an amended complaint. *Id.* NutriSearch and MacWilliam responded by filing a second motion to dismiss. *Id.* Ariix claimed that NutriSearch and MacWilliam had violated the Lanham Act by misrepresenting the Guide. *Id.* at 15-16. However, the district court concluded that the Guide was not within the scope of the Lanham Act because it is not commercial speech. *Id.* On March 4, 2019, the Southern District of California dismissed Ariix's amended complaint with prejudice. *Id.* at 17.

Ariix appealed the decision to the Ninth Circuit, which reversed the district court's decision after finding that the Guide was commercial speech. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1118 (9th Cir. 2021) ("Many of Ariix's allegations raise significant doubts about whether the Guide is an objective compilation of product reviews and suggest that the Guide is instead a sham marketing scheme intended to benefit Usana."). However, because the parties had not briefed whether Usana's supplements were attributable to MacWilliam and NutriSearch as the "defendants' goods," the Ninth Circuit remanded the issue to the district court. *Id.* at 1120. The Ninth Circuit advised the parties to consider whether MacWilliam and NutriSearch were in an agency relationship with Usana. *Id.* at 1120, n. 10. Upon notice of the Ninth Circuit's decision,

Ariix immediately filed a motion to add Usana as a defendant. ECF No. 19 at 7. On May 26, 2021, the Southern District of California granted Ariix's motion. *Id.*

On August 16, 2021, Usana filed a motion to dismiss, arguing that it was not subject to personal jurisdiction in California. ECF No. 17-3 at 2. On March 22, 2022, the United States District Court for the Southern District of California agreed with Usana's assertion and dismissed the case against Usana for lack of personal jurisdiction. *Id.* The court also denied Ariix' request to transfer the case. *Id.* at 13. On, May 6, 2022, Ariix filed a complaint against Usana before this Court. ECF No. 2. As Usana is incorporated in Utah, this court indisputably has personal jurisdiction over Usana. Ariix's proceeding against MacWilliam and NutriSearch is concurrently pending in the Southern District of California. *See Ariix, LLC v. NutriSearch Corp.*, Case No. 17-cv-320-LAB-BGS (S.D. Cal. 2023).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). "The burden is on the plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *Id.* (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563.

Courts may take judicial notice of directly relevant proceedings in other courts. *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979). "Facts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." *Hodgson v. Farmington City*, 675 F. App'x 838, 841 (10th Cir. 2017) (citation omitted).

## ANALYSIS

As a threshold issue, the court addresses Usana's request that the court take judicial notice of the pleadings and record in *Ariix, LLC v. NutriSearch Corp.*, which is currently pending before the United States District Court for the Southern District of California, Case No. 17-cv-320-LAB. (ECF No. 18.) "[F]ederal courts . . . may take notice of proceedings in other courts, . . . if those proceedings have a direct relation to matters at issue." *St. Louis Baptist Temple, Inc.*, 605 F.2d at 1172. Both parties agree that this case is substantially related to Ariix's case against NutriSearch and MacWilliam. And in fact, Ariix contends that "considerations of judicial economy, efficiency, expense, and delay all favored including all defendants—Usana, NutriSearch, and MacWilliam—in a single venue." ECF No. 19 at 7. Because the action pending before the Southern District of California directly relates to this one, the court grants Usana's request and takes judicial notice of the California case.[2]

Usana asks the court to dismiss Ariix's complaint either because Ariix's claim is untimely or because the complaint fails to state a claim. The court addresses the timeliness concern first.

---

[2] The primary difference between this complaint and the complaint filed in the Southern District of California is that this complaint omits dates that were included in the California complaint. For example, the California complaint clarifies that Ariix applied for Gold Medal Certification, which NutriSearch denied, in 2014 and 2015. ECF No. 17-2 at 23-25. In considering this motion, the court incorporates any corresponding dates from the California complaint.

## I.      Timeliness

Usana asserts that Ariix's Lanham Act claim against Usana is untimely. According to Usana, the court should analyze Ariix's untimeliness under an affirmative statute of limitations defense. ECF No. 17 at 5. Because the Lanham Act does not specify a limitations period, the statute of limitations should be determined by reference to the limitations period for analogous state law claims. *Id.* Under Utah law, a plaintiff has three years from when the plaintiff discovers the fraud to file a fraud claim. *See* Utah Code §78B-2-305(3). Usana alleges that, at the latest, Ariix discovered the fraud by February 16, 2017. ECF No. 17 at 7. On that date, Ariix filed a complaint against MacWilliam and NutriSearch that contained substantially similar factual and legal allegations as the ones contained in this complaint. *Id.* Moreover, the 2017 complaint specifically noted Usana's involvement. ECF No. 17-2. Because more than five years passed from February 16, 2017 to May 6, 2022, when Ariix filed this complaint, Usana asks the court to dismiss Ariix's complaint as untimely. In contrast, Ariix asks the court to analyze Usana's timeliness defense under the doctrine of laches.

"[T]he Lanham Act, which governs trademarks, contains no statute of limitations, and expressly provides for defensive use of 'equitable principles, including laches.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 n. 15 (2014) (quoting 15 U.S.C. § 1115(b)(9)); *see, e.g.*, *Strauss v. Angie's List, Inc.*, No. 217CV02560HLTTJJ, 2019 WL 399910, at *4 (D. Kan. Jan. 31, 2019) (barring Plaintiff's Lanham Act false advertising claim under the affirmative defense of laches). Laches and statutes of limitations both "shield against untimely claims," but "statute[s] of limitations necessarily reflect[] a congressional decision that the timeliness of covered claims is better judged on the basis of a generally hard and fast rule rather than the sort of case-specific judicial determination that occurs when a laches defense is asserted." *SCA Hygiene Prod.*

*Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. 328, 334–35 (2017). In other words, unlike with statutes of limitations, there is no fixed time period before laches bars a plaintiff's claim. *See Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1091 (10th Cir. 2014) ("Courts apply the delay and prejudice elements with flexibility."); *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324, 1338 (10th Cir. 1982) ("Mere lapse of time does not amount to laches.").

As a preliminary matter, the Tenth Circuit "has not yet addressed the relevant statute of limitations under the Lanham Act . . . ." *United States v. Foote*, 413 F.3d 1240, 1247 (10th Cir. 2005). When a federal statute does not expressly provide a limitations period, "[w]e have generally concluded that Congress intended that the courts apply the most closely analogous statute of limitations under state law." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983). However, "in some cases we have declined to borrow state statutes but have instead used timeliness rules drawn from federal law—either express limitations periods from related federal statutes, or such alternatives as laches." *Id.* at 162. The Fourth Circuit concluded that "a state statute of limitations would be an unsatisfactory vehicle for enforcement [of the Lanham Act]. Rather, the affirmative defense of laches, which applies to claims that are equitable in nature, 'provides a closer analogy than available state statutes.'" *Belmora LLC v. Bayer Consumer Care AG*, 987 F.3d 284, 293 (4th Cir. 2021) (quoting *DelCostello*, 462 U.S. at 172); *see also Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836–37 (9th Cir. 2002) (analyzing defendant's timeliness defense under the doctrine of laches after noting that "[t]he proper interplay between laches and the statute of limitations for Lanham Act claims is somewhat elusive" and that "it is uncertain whether Congress intended the statute of limitations to be a separate defense . . . ."); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999) ("Because the Lanham Act does not contain a statute of limitations, federal courts have referred to analogous state statutes of limitations to

determine whether a presumption of laches should apply."); *Patrick v. Cadillac Lounge, L.L.C.*, 504 F. Supp. 3d 5, 7 (D.R.I. 2020) ("[N]o federal or state court has set a statute of limitations in a Lanham Act case. The Court will not ignore the plain wording of the statute and declines to inappropriately legislate by writing a limitations period into the Lanham Act where there is none.").

During oral argument, counsel for Usana urged this court to follow the approach taken in *J. White, L.C. v. Wiseman*, No. 2-16-CV-01179-DBB-JCB, 2020 WL 3922977, at *5-6 (D. Utah July 10, 2020) and analyze whether Ariix's Lanham Act claim was barred by Utah's most closely analogous statute of limitations rather than laches. However, the Tenth Circuit has stated that "[a]lthough some courts have read the Lanham Act to incorporate analogous state statutes of limitations, these limitations periods arise only by implication and are not 'expressly provided by law.'" *Foote*, 413 F.3d at 1247 (internal citation omitted). And other cases in this district have analyzed the timeliness of a plaintiff's Lanham Act claims under the doctrine of laches. *See Icon Health & Fitness, Inc. v. Nautilus Grp., Inc.*, No. 1:02CV00109TC, 2004 WL 6031124, at *19 (D. Utah Dec. 21, 2004) ("Because the Lanham Act does not contain a statute of limitations, courts have uniformly applied the doctrine of laches (an equitable principle) to determine if false advertising claims should be barred."); *Albion Int'l, Inc. v. Am. Int'l Chem., Inc.*, Case No. 2:07-cv-0994-CW, 2012 WL 3776866 at *4-9 (D. Utah Aug. 30, 2012) ("The presumption of laches would apply to preclude Albion's false advertising claim, then, if AMT shows that the statute of limitations for fraud would have run had it been applied to the claim."). Absent clear guidance from the Tenth Circuit on whether a statute of limitations defense is available under the Lanham Act, and how to apply such a defense, this court declines to follow the approach established in

*White*, and instead analyzes the timeliness of Ariix's Lanham Act claim under the doctrine of laches.

Ariix asks the court to reserve ruling on the affirmative defense of laches until discovery has been completed. ECF No. 19 at 9–10. "[A]ffirmative defenses must generally be pled in the defendant's answer, not argued on a motion to dismiss . . . ." *Anderson Living Tr. v. WPX Energy Prod., LLC*, 27 F. Supp. 3d 1188, 1209 (D.N.M. 2014). The resolution of laches is typically a fact intensive affirmative defense inquiry that is not resolved at the motion to dismiss stage. *See Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 929 (D. Kan. 2014) ("The strictures of Rule 12(b)(6), wherein dismissal of the claim is based solely on the complainant's pleading, are not readily applicable to a determination of laches.") (internal citation omitted). However, "there is no *per se* rule that affirmative defenses are inappropriate for consideration on a Rule 12(b) motion to dismiss." *Strauss*, 2019 WL 399910, at *3. At the motion to dismiss stage, a claim may be barred by laches when "the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC,* 883 F.3d 1296, 1299 (10th Cir. 2018). To prove the affirmative defense of laches on a motion to dismiss, the complaint must clearly establish that "there has been an unreasonable delay in asserting the claim, *and* that the defendant was materially prejudiced by the delay." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1208 (10th Cir. 2001) (emphasis in original) (citation omitted).

The court is persuaded that the complaint does not demonstrate Ariix's delay in filing suit materially prejudiced Usana. "Laches, in legal significance, is not mere delay, but delay that works a disadvantage to another." *Rodriguez-Aguirre*, 264 F.3d at 1208 (citation omitted). Material prejudice can be either economic or evidentiary. *Albion*, 2012 WL 3776866, at *9. Evidentiary prejudice occurs when the defendant loses evidence due to the plaintiff's delay in bringing the suit.

"Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001). The defendant must specifically identify the relevant evidence that has been lost. *Albion*, 2012 WL 3776866, at *10.

Usana asserts that "[it] is prejudiced by fading memories, lost evidence, and the other difficulties associated with defending against stale claims – certainly inherent in a delay of so many years." ECF No. 31 at 5. Not only is Usana's statement conclusory, nothing on the face of the complaint establishes that Usana has lost relevant evidence. On the contrary, the complaint alleges that Usana was either in a principal-agent relationship with MacWilliam and NutriSearch or that Usana conspired with them. Under these theories, Usana would have been aware of the ongoing litigation between MacWilliam, NutriSearch, and Ariix. The court is persuaded that the complaint does not establish that Ariix's delay caused Usana evidentiary prejudice.

Alternatively, Usana argues that the complaint establishes that Usana has suffered economic prejudice because Ariix alleges that Usana's conduct continues to harm Ariix. *Id.* at 5. But this does not demonstrate economic prejudice. Economic prejudice "exists when a defendant can show that a plaintiff's delay caused the defendant to take actions or experience consequences that would not have otherwise occurred had there been no delay." *Albion*, 2012 WL 3776866, at *9. The defendant must demonstrate that it continued to invest in the allegedly challenged behavior to its own detriment, in reliance that plaintiff would not bring a suit. *Id.* at *11. But the mere fact that Ariix alleges damages does not establish that Usana continued to invest in the Guide or otherwise took actions in reliance on Ariix's delay in filing suit. The only line in the complaint that concerns Usana's investment is a sentence in the introduction that states that "Usana pays MacWilliam and his company, NutriSearch Corporation, hundreds of thousands of dollars per year

out of its marketing budget, all to push Usana's commercial messages to consumers while concealing Usana's control of their actions and editorial control of the Guide's content." ECF No. 2 at 2–3. Standing alone, this conclusory allegation does not warrant dismissal of Ariix's complaint. *See Strauss*, 2019 WL 399910, at *4 ("The original complaint details how Defendant's business model and profits changed during the time period Plaintiff Strauss delayed in filing suit, specifically alleging drastic increases in revenue as Defendant became more focused on relationships with advertising (fee-paying) service providers and less focused on consumers."). Indeed, Usana vehemently denies any suggestion that it invested in or controlled the Guide. Thus, the court is persuaded that the complaint itself does not establish that Ariix's delay caused Usana to suffer economic hardship.

Because the complaint does not establish that Usana suffered material prejudice, the court DENIES Usana's request to dismiss the case on timeliness grounds.

## II.      Failure to State a Claim

Having addressed laches, the court moves to whether the complaint states a claim for relief under the Lanham Act. Ariix asserts that Usana may be either directly liable for the Guide's false statements or secondarily liable under a principal-agent theory. The court is persuaded that Ariix has pled facts in the complaint that support both Usana's direct and secondary liability.

A. Usana is Directly Liable Because it Used MacWilliam and NutriSearch's Misrepresentations

Usana claims that Ariix cannot demonstrate that Usana violated the Lanham Act because Ariix has not alleged that Usana "made material false or misleading representations of fact . . . ." *Cottrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999). The complaint alleges

15

only that MacWilliam and NutriSearch made false statements. Usana asserts that it cannot be liable for false statements made by third parties, citing *Outlaw*, *Baldino's*, and *Lasoff* for support. *See* Def. Mot. Dismiss, ECF No. 17 at 10; *Outlaw Lab'y, LP v. Shenoor Enter., Inc.*, 371 F. Supp. 3d 355, 363 (N.D. Tex. 2019); *Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, 88 F. Supp. 3d 543, 551 (E.D. Va. 2015), *aff'd*, 624 F. App'x 81 (4th Cir. 2015); *Lasoff v. Amazon.com Inc.*, Case No. C16-151-BJR, 2017 WL 372948 (W.D. Wash. Jan. 26, 2017), *aff'd sub nom. Lasoff v. Amazon.com, Inc.*, 741 F. App'x 400 (9th Cir. 2018).

However, these cases can be distinguished as they all apply the retailer exception to third party liability. "[A] retailer is not liable if the retailer played no role in making the products or in formulating or disseminating the alleged false statements . . . ." 5 McCarthy on Trademarks and Unfair Competition § 27:34.50 (5th ed.). In *Outlaw*, the plaintiff sued a retailer for misrepresentations that were printed on the packaging of a male enhancement drug. 371 F. Supp. 3d at 358. According to the plaintiff, the store made false statements by selling the product with the misleading label affixed. *Id.* The district court rejected this claim. *Id.* at 362. Even though the misleading statements caused consumers to purchase more of the product, the connection between the retailer and the maker of the false statement was too attenuated to hold the retailer liable for the manufacturer's statements. *Id.* at 363.

*Baldino's* and *Lasoff* extend the retailer exception to digital commerce. In *Baldino's*, the plaintiff sued Google for displaying websites of unlicensed locksmiths who had falsely claimed that they were licensed. *Baldino's*, 88 F. Supp. 3d at 546. The district court held that Google was not liable for displaying information that included third party misrepresentations. *Id.* at 551. In *Lasoff*, the plaintiff sued Amazon for selling products that contained misleading claims that were made by the third-party seller. *Lasoff* at *1–2. The district court concluded that Amazon was not

responsible because "liability lies with the vendors who created the misleading content, not the service providers who transmit that content." *Id.* at *8. *Outlaw*, *Baldino*, and *Lasoff* do not shield a defendant who uses false advertising made by a third party from all Lanham Act liability, but rather create a limited exception to liability when the defendant is a retailer who had no knowledge or role in the third party's misrepresentation.

The court is convinced that Usana does not qualify for the retailer exception. MacWilliam and NutriSearch's misrepresentations directly promote Usana's supplements and Usana did not inadvertently display third-party products with misleading labels. Rather, Usana knowingly took advantage of and encouraged MacWilliam and NutriSearch's misrepresentations in order to sell its supplements. "A plaintiff has a § 43(a) claim against 'all those allegedly responsible for falsely describing and placing in commerce the advertised goods.'" McCarthy § 27:52 (quoting *Grant Airmass Corp. v. Gaymar Industries, Inc.*, 645 F. Supp. 1507, 1511 (S.D.N.Y. 1986)). Because the court is persuaded that the retailer exception does not apply, the court analyzes Usana's direct liability under the Lanham Act's general liability principles.

Ariix contends that Usana is directly liable because Usana *used* a misleading statement to promote its products. Ariix cites *Vitamins Online* in support. *Vitamins Online, Inc. v. HeartWise, Inc.*, 207 F. Supp. 3d 1233 (D. Utah 2016), *vacated in part on reconsideration*, No. 2:13-CV-982-DAK, 2017 WL 2733867 (D. Utah May 11, 2017). In this case, Vitamins Online sued NatureWise for manipulating the priority of reviews that appeared on NatureWise's Amazon webpage. *Id.* at 1236. Amazon enables customers to rate the helpfulness of reviews that appear on a product page. *Id.* at 1243. NatureWise had instructed its employees to vote that customer reviews that portrayed NatureWise supplements favorably were helpful, and that negative product reviews were unhelpful. *Id.* at 1244. As a result, positive reviews appeared before negative ones. *Id.* at 1243.

17

Vitamins Online, a competitor, alleged that NatureWise's conduct violated the Lanham Act's prohibition against false advertising, 15 U.S.C. § 1125(a). *Id.* at 1236. NatureWise argued that it had not violated the Lanham Act because it was not responsible for writing the customer reviews. *Id.* at 1240. The court rejected NatureWise's theory.[3] *Id.* at 1241. "[T]o fall within the text of the Lanham Act, a defendant does not need to make a statement but only needs to use a statement or other form of conduct specified in the Act." *Id.* In other words, the fact that the defendant *uses* but did not *make* a false statement does not shield a defendant from liability under the Lanham Act. *See also Crocs, Inc. v. Effervescent, Inc.*, No. 06-CV-00605-PAB-KMT, 2017 WL 4286148, at *13 (D. Colo. Sept. 25, 2017) ("The [Lanham Act] itself does not insulate individuals from liability who authorize the use of false statements in commerce, and defendants cite no authority barring Lanham Act liability where a defendant approves promotional statements that he or she knows are false."), *on reconsideration*, No. 06-CV-00605-PAB-KMT, 2021 WL 952215 (D. Colo. Mar. 11, 2021).

In short, the court agrees with Ariix that Usana may be liable if it used a misleading statement. Usana's argument that it is not liable because it did not *make* the misrepresentation directly contradicts the language of the Lanham Act. *See* 15 U.S.C. § 1125 (emphasis added) (extending liability to "[a]ny person who . . . *uses* [a misrepresentation] . . . in commercial

---

[3] Although *Vitamins Online* was overturned on a motion for reconsideration, the rationale for overturning was unrelated to Lanham Act liability for use of a third party's statements. *See Vitamins Online v. HeartWise, Inc.*, No. 2:13-CV-982-DAK, 2017 WL 2733867 (D. Utah May 11, 2017).

advertising or promotion . . . ." ). It also contradicts *Vitamins Online* and *Crocs*. Thus, the court rejects Usana's interpretation of the Lanham Act.

The court is persuaded that the facts on the complaint support the inference that Usana used a false statement. The complaint includes events that establish that Usana was both aware of and encouraged MacWilliam and NutriSearch's misrepresentations. MacWilliam told Usana executives that he planned to resign from Usama's board of directors to promote the Guide's appearance of independence. ECF No. 2 at 10. MacWilliam requested financial support from Usana, which Usana agreed to provide, so long as Usana retained the top rating in the Guide. *Id.* Usana knew that MacWilliam and NutriSearch manipulated the Guide's ratings, yet nevertheless, used their reputation for objectivity to sell its supplements. Usana published a picture of MacWilliam and the Guide, next to MacWilliam's positive testimonial on Usana's Facebook page. *Id.* at 25 ("USANA's [new product] is a real game changer that raises the bar for the industry. That's why I have full confidence that USANA will once again stand out as an industry leader and will continue to receive an elite standing in the new Comparative Guide."). Every time Usana won a medal of achievement, it issued a press release quoting the Guide's statements that the Guide employed an independent and objective ranking mechanism, despite Usana knowing and actively encouraging the contrary. *Id.* Although Usana itself did not state that the Guide was independent, Usana directly used MacWilliam and NutriSearch's misrepresentations to promote Usana's supplements. Thus, the court is persuaded that the complaint pleads facts that can support the inference of Usana's direct liability.

B.     Usana is Secondarily Liable for MacWilliam and NutriSearch's Misrepresentations
         because MacWilliam and NutriSearch were Acting as Usana's Agents in Making
         the Misrepresentations

Although the court has already concluded that Usana may be directly liable for using the misrepresentations made by MacWilliam and NutriSearch, the court nevertheless moves to the matter of Usana's secondary liability for the misrepresentations. Ariix alleges that Usana may be secondarily liable for the misrepresentations made by MacWilliam and NutriSearch because MacWilliam and NutriSearch were acting as Usana's agents. Pl.'s Resp., ECF No. 19 at 17–20.

The Lanham Act states:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). The Lanham Act does not expressly address the scope of secondary liability. *See* McCarthy § 27:52; *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1429 (3d Cir. 1994) [hereinafter *AT&T*] ("The statute, by referring to 'any person' who infringes on a plaintiff's rights, is silent as to the existence, or the scope, of vicarious liability . . . ."). In *AT&T*, the Third Circuit concluded that principals may be liable for violations of the Lanham Act committed by their agents because the Lanham Act prohibits the tort of unfair competition, and at common law, principals are vicariously liable for torts committed by their agents within the scope of the agency relationship. *AT&T*, 42 F.3d at 1427–35. The Tenth Circuit has adopted the Third Circuit's approach that "§ 43(a) [incorporates] common law concepts of agency, apparent authority, and vicarious liability." *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1127 (10th Cir. 2003) (quoting McCarthy on Trademarks and Unfair Competition § 27:53 (4th ed. 2002)); *1-*

*800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) ("Vicarious liability arises when common-law principles of agency impose liability on the defendant for the infringing acts of its agent.").

To establish Usana's vicarious liability, the complaint must include facts that plausibly support the existence of an agency relationship and that support that the misrepresentations were made within the scope of the agency relationship.[4] "To establish agency, a party must show (1) the principal manifested its intent that the agent act on its behalf, (2) the agent's consent to act on the principal's behalf, and (3) that both the principal and the agent understood that the agent is subject to the principal's control." *White*, 2020 WL 3922977, at *3; *Sutton v. Miles*, 333 P.3d 1279, 1282 (Utah Ct. App. 2014); Restatement (Third) of Agency § 1.01 (2006). Whether an agency relationship exists depends on "all the facts and circumstances in the case." *Proctor & Gamble Co. v. Haugen,* 222 F.3d 1262, 1278 (10th Cir. 2000).

---

[4] In a dissenting opinion in the Ninth Circuit appeal of *Ariix*, Judge Daniel Collins concluded that "Ariix's complaint contains no allegations that would support the view that Defendants are Usana's agents or that Defendants altered or placed specific content in the *Guide*'s reviews at Usana's direction." *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1126 (9th Cir. 2021) (Collins, J., dissenting). While this court agrees that the factual details in the complaint are sparse, it is not bound by the conclusions in Judge Collins's dissent. And it disagrees that "the complaint's factual allegations establish, at most, that Defendants produced biased reviews in the craven hope that Usana would then act in ways that were economically favorable to Defendants." *Id.* First, the parties did not have the opportunity to brief the agency issue that Judge Collins addressed in his dissent. *See id.* at 1120, n. 10. Moreover, the dissent emphasized that the complaint did not establish an agency relationship because "it fails to allege facts showing that" MacWilliam and NutriSearch had agreed to serve as Usana's "paid publicists" in writing the Guide. *Id.* at 1127 (Collins, J., dissenting). But the "paid publicist" language is used to determine whether speech is commercial speech, and not whether an agency relationship exists. *See United States v. Wegner*, 427 F.3d 840, 848 (10th Cir. 2005). In other words, the complaint does not need to establish that MacWilliam and NutriSearch served as Usana's paid publicists in order to find that MacWilliam and NutriSearch were serving as Usana's agents.

One way of demonstrating the principal's assent and the agent's consent is through an agency agreement. *See Wardley Corp. v. Welsh*, 962 P.2d 86, 89 (Utah Ct. App. 1998) (internal citation omitted) ("'[A]n agency is created and authority is actually conferred very much as a contract is made': a meeting of the minds must exist between the parties."); Restatement (Third) of Agency § 1.03 (2006) ("A person manifests assent or intention through written or spoken words or other conduct."). But a plaintiff does not need to show an actual agreement or plead specific details regarding the terms of the agency agreement. *See Lundstrom v. Choice Hotels Int'l, Inc.*, No. 21-CV-00619-PAB-SKC, 2021 WL 5579117, at *9 (D. Colo. Nov. 30, 2021) ("Plaintiff's allegations regarding the training or policies that defendant controls, however, are at best vague and conclusory because they are devoid of any details. Nevertheless, the Court will assume that the allegations are sufficient to show an actual agency relationship between defendant and the Quality Inn and Sleep Inn . . . ."). So long as the complaint includes facts that may plausibly support the inference that the principal assented, the agent consented, and the principal had control, the agency relationship survives the motion to dismiss stage. *See Stamper v. Johnson*, 232 P.3d 514, 518 (Utah 2010) ("An agency relationship . . . may have existed if the relationship meets three factual elements: (1) there was a manifestation by Gilbert Development that Johnson would act on its behalf, (2) Johnson accepted the proposed undertaking, and (3) the parties understood that Gilbert Development controlled the undertaking.").

The court is persuaded that Ariix has pled facts that support the inference that Usana assented to MacWilliam and NutriSearch acting on Usana's behalf. Ariix alleges that an agreement existed between Usana, MacWilliam, and NutriSearch and that the agreement "firmly established that, though cloaked in secrecy and designed to appear independent, Usana exercised control over editorial decisions . . . ." ECF No. 2 at 10. Usana asserts however, that "there is no plausible

22

allegation of an agreement" because the complaint does not provide "the terms of performance, when it was entered, or other basic terms." ECF No. 17 at 13. While the complaint provided very few details about the agreement, contrary to Usana's assertion, it does include the time and terms of the agreement. The agreement was allegedly entered into in 2005 after a competing supplement provider revealed MacWilliam's Usana affiliation. ECF No. 2 at 10; ECF No. 17-2 at 12. Ariix pled that the agreement involved Usana exchanging financial support in return for the top rating in the Guide. ECF No. 2 at 10. ("MacWilliam told . . . Usana executives: 'I should not be on the board . . . anymore because it looks like I'm biased. I am going to create more of a third-party appearance, but I'd like you to use me for speaking and support me.' Usana said, 'Yes, if you give us the number-one rating.'"). Although these agreement details are not required to establish the existence of an agency relationship at the motion to dismiss stage, the court finds that the complaint satisfies this standard. Thus, the court is persuaded that an agreement existed that plausibly establishes Usana's assent.[5]

---

[5] Even if the agreement only provides weak support of Usana's assent, the complaint includes additional facts demonstrating Usana's assent. "A principal's manifestation of assent to an agency relationship may be informal, implicit, and nonspecific." Restatement (Third) of Agency § 1.01 cmt. d (2006). In 2010, five years after the agreement had been entered into, one of Usana's executives told MacWilliam that "we pay you to make us number one." ECF No. 2 at 13. Usana receives a portion of the profits generated from sales of the Guide. *Id.* at 11–12. Usana encourages its representatives to "get the Guide, learn it, refer to it in making sales, and even pitch the Guide to end consumers," as part of Usana's marketing training program. *Id.* at 11. At Usana's annual conference, MacWilliam is the only independent speaker who is allowed to sell his own product. *Id.* Usana displays the Guide on its social media pages and issues press releases quoting the Guide's claims of independent objectivity when Usana wins an award. Indeed, Usana characterizes payments to MacWilliam and NutriSearch as marketing expenses. Accordingly, the court is persuaded that the complaint includes facts that can support the inference that Usana assented to MacWilliam and NutriSearch acting as Usana's agents.

The facts also demonstrate that MacWilliam and NutriSearch consented to act on Usana's behalf. In addition to establishing Usana's assent, the 2005 agreement establishes MacWilliam's consent. MacWilliam told Usana executives that "I should not be on the board or a representative of the company anymore because it looks like I'm biased. I am going to create more of a third-party appearance, but I'd like you to use me for speaking and support me." *Id.* MacWilliam's statement manifests an objective understanding that he is acting for Usana's benefit. In 2008, Usana withdrew its financial support from MacWilliam after the Guide awarded several other supplement companies the same Gold Medal rating as Usana. *Id.* at 12. MacWilliam confronted Usana, and Usana responded that Usana wanted to exclusively occupy the number one position. *Id.* MacWilliam then created an "Editor's Choice" category in the Guide, which Usana exclusively won. *Id.* Subsequently, "MacWilliam approached Usana executives for his reward." *Id.* at 12–13 ("My income is down. I would like to do a tour for Usana. . . . I'll speak on the comparative guidebook and the benefits of Usana. Usana is number one Editor's Choice . . . I can go on a summer-long vacation and basically I want you to pay for it."). Usana paid MacWilliam $90,000 for a summer tour. *Id.* at 13. MacWilliam's demand to be compensated for making Usana number one supports the inference that MacWilliam consented to serve as Usana's agent. Indeed, the next year, after informing Usana executives that Usana would no longer maintain the top spot in the Guide under the publicized rubric, MacWilliam revised the rubric criteria. *Id.* at 13. The facts listed in the complaint support the inference that MacWilliam consented to act on Usana's behalf in writing the guide.

The last element of an agency relationship is control. "The control element focuses on whether the principal 'controls, or has the right [to] control, the *manner* in which the operations are to be carried out . . . .'" *Sutton*, 333 P.3d at 1282 (emphasis in original) (citation omitted). A

principal will not be liable for the tortious acts committed by its agent if the principal cannot control the agent. *See Mecham v. Consolidated Oil*, 53 P.3d 479 (Utah Ct. App. 2002) (rejecting the bank's liability in a personal injury suit because the bank lent the refinery credit but had no direct control over the oil refinery's actions). The determination of control is a fact specific.

> The right-of-control test considers several factors, none of which is "completely controlling": (1) the existence of covenants or agreements "concerning the right of direction and control over the [agent]," (2) whether the principal has "the right to hire and fire" the agent, (3) "the method of payment (i.e., wages versus payment for a completed job or project)," (4) who furnishes the equipment, (5) "the intent of the parties," and (6) "the business of the employer."

*Sutton*, 333 P.3d at 1282–83 (internal citation omitted). Fundamentally, the court asks whether "both [parties] understood that [the principal] was to be in charge of the undertaking." *Wardley Corp. v. Welsh*, 962 P.2d 86, 89 (Utah Ct. App. 1998).

The court is persuaded that the complaint supports an inference that Usana controlled MacWilliam and NutriSearch. Usana directed MacWilliam to keep Usana at the top of the Guide's ratings, and conditioned speaking gigs and book sales on MacWilliam meeting this requirement. MacWilliam was required to meet with Usana annually to ensure that Usana maintained the top position. Even though Usana did not tell MacWilliam what to include in the Guide, MacWilliam understood that his general directive was to keep Usana at the top. ECF No. 2 at 13 ("[W]e pay you to make us number one"). In fact, the year that MacWilliam knew that Usana would not be ranked in the number one position, MacWilliam met with Usana executives and reformulated the ranking rubric. *Id.* In 2008, when MacWilliam appeared to have strayed from his directive by awarding multiple supplement companies the same Gold Medal rating as Usana, Usana withdrew its financial support. *Id.* at 10. The next year, MacWilliam established an "Editor's Choice award" that only Usana received. *Id.* at 12.

Furthermore, Ariix alleges that each time Usana updated its product labels, the Guide concurrently updated its evaluation criteria to parrot Usana's marketing strategies. In 2013, Usana increased the vitamin D and iodine content in its supplements and rebranded to focus on these changes. ECF No. 17-2 at 19. The Fifth Edition of the Guide was then "'rewritten from cover to cover' to discuss 'the most recent and exciting findings on two super-nutrients: Vitamin D and Iodine' . . . ." ECF No. 2 at 14 (internal citation omitted). Usana changed its supplement labels and claimed that its supplements promoted "cell-signaling." *Id.* Immediately thereafter, the Sixth Edition of the Guide stated that "'the guide has been completely rewritten in light of recent groundbreaking discoveries from the world of nutritional research' on cell signaling." *Id.* (internal citation omitted). Considered in the context of Ariix's other allegations regarding an agreement between Usana, MacWilliam, and NutriSearch, the court is persuaded that these facts raise the inference of control.

In summary, the complaint has alleged facts that support Usana's assent, MacWilliam and NutriSearch's consent, and Usana's control over MacWilliam and NutriSearch. Thus, the court is persuaded that Ariix has plausibly alleged that MacWilliam and NutriSearch were in an agency relationship with Usana.

Having established that MacWilliam and NutriSearch were acting as Usana's agents, the court moves to whether Usana authorized MacWilliam and NutriSearch to make misrepresentations about the Guide. *1-800 Contacts*, 722 F.3d at 1251 ("[A] principal is subject to liability for its agent's tortious conduct only if the conduct 'is within the scope of the agent's actual authority or ratified by the principal.'") (quoting Restatement (Third) of Agency § 7.04)). A principal can authorize its agent to act through either actual authority or apparent authority. *Proctor & Gamble*, 222 F.3d at 1278. "An agent acts with actual authority when, at the time of taking

26

action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). Actual authority can occur either via express actual authority, where an agent acts pursuant to the principal's specific directions, or implied authority, where the principal authorizes the agent "to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Proctor & Gamble*, 222 F.3d at 1278 (internal citation omitted).

The court is persuaded that Usana may be liable for the misrepresentations made by MacWilliam and NutriSearch because MacWilliam and NutriSearch acted under actual authority in making the misrepresentations. "[L]iability can arise under the Lanham Act if websites purporting to offer reviews are in reality stealth operations intended to disparage a competitor's product while posing as a neutral third party." *GOLO, LLC v. HighYa, LLC*, 310 F. Supp. 3d 499, 505 (E.D. Pa. 2018). Usana instructed MacWilliam and NutriSearch to keep Usana in the top position in the Guide in exchange for financial support, pursuant to their actual agreement. Usana was aware of and encouraged MacWilliam's decision to make the Guide appear independent and objective. MacWilliam reformulated the Guide's objective ranking mechanism and published new editions of the Guide to maintain Usana's number one ranking. Usana even exerted control over finer editorial details such as requiring the Sixth Edition of the Guide to incorporate a new Platinum Achievement award. Thus, the court is persuaded that MacWilliam and NutriSearch were acting within the scope of the agency relationship in misrepresenting the Guide as independent and objective.

Having established that MacWilliam and NutriSearch were acting as Usana's agents and that MacWilliam and NutriSearch made the misrepresentations under Usana's actual authority, the court concludes that the complaint can support Usana's secondary liability under an agency theory.

## CONCLUSION & ORDER

In summary, the court concludes that the complaint on its face does not establish the affirmative defense of laches because it does not demonstrate that Usana suffered material prejudice. Furthermore, the complaint sufficiently establishes a claim against Usana for direct violation of the Lanham Act and secondary violation of the Lanham Act pursuant to a principal-agent theory.

For the foregoing reasons, the court DENIES the motion to dismiss filed by Usana. ECF No. 17.

DATED March 20, 2023.

BY THE COURT

Jill N. Parrish
United States District Court Judge

28